Filed 8/12/26  P. v. Larrimore CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B341153 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA347367) |
| v. | |
| LARON LEE LARRIMORE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, Heidi Salerno and David Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

In 2006, Laron Lee Larrimore, a member of the Black P. Stones gang, was driving a fellow gang member to a gang meeting in a local park when Larrimore saw Cesar Avila in his parked car. Thinking Avila was a member of the rival 18th Street gang, Larrimore pulled up next to Avila's car. Larrimore's passenger fired two gunshots at Avila and a third gunshot into Avila's car where his young daughters Kaitlyn and Cassey were seated. The gunshots seriously wounded Avila and killed Kaitlyn.

A jury convicted Larrimore of the second degree murder of Kaitlyn and the attempted premeditated murder of Avila, after the trial court instructed the jury on the natural and probable consequences doctrine. Larrimore later petitioned for resentencing under Penal Code[1] section 1172.6 (former section 1170.95) as to both convictions. Following an evidentiary hearing, the superior court denied the petition, finding the People proved beyond a reasonable doubt that Larrimore was guilty of murder and attempted murder under a theory of direct aiding and abetting. On appeal, Larrimore argues substantial evidence does not support the superior court's determination as to his murder conviction only. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Charges*

The People jointly charged Larrimore and codefendant Jonathan Banks with the murder of Kaitlyn (§ 187, subd. (a)), the attempted willful, deliberate, and premeditated murder of Avila (§§ 664 & 187, subd. (a)), and the attempted willful, deliberate,

---

[1] Statutory references are to the Penal Code.

2

and premeditated murder of Cassey (§§ 664 & 187, subd. (a)). The People alleged several firearm enhancements (§ 12022.53, subds. (b)-(e)) and a gang enhancement (§ 186.22, subd. (b)) for each offense.

Larrimore and Banks were jointly tried by a jury.

B. *Prosecution Evidence at Trial*

1. *The shooting*

On September 24, 2006, Avila parked his blue car in front of his apartment building on Pinafore Street. Avila's three-year-old daughter Kaitlyn was seated in the rear passenger seat, and his five-year-old daughter Cassey was seated next to her. Avila stepped out of the car and was about to open Kaitlyn's door when a silver SUV stopped two feet beside him.

The front passenger window of the SUV was rolled down, and the rear windows were tinted. A person in the front passenger seat yelled, " 'Fuck 18.' " Avila turned around and saw the passenger and the driver, who were both looking at him. The passenger yelled, " 'Black P. Stones,' " pulled out a gun, and fired one shot at Avila through the window, hitting him in the chest. Avila immediately ran toward his apartment building. The SUV passenger got out of his car and fired a second shot at Avila that struck his hand. Avila continued to run into the building and collapsed in the courtyard where his wife and neighbors came to help him. At trial, Avila identified the shooter as Banks and the SUV's driver as Larrimore. Avila was not a member of any gang.

At the time of the shooting, Marvin Barahona was standing about 36 feet from Avila's blue car. Barahona saw a man get out of Avila's car while a silver SUV stopped next to Avila's car. Barahona heard a gunshot and saw a man exit the SUV from the front passenger seat and chase after Avila. As the man chased

3

Avila toward the apartment building, the man had his arm extended as if he was holding a gun, and Barahona heard a second gunshot. Barahona then saw the man run back to Avila's car, open the rear door, and fire a third gunshot into the car. After the third shot, the man appeared to reach for an object on the ground before getting back into the SUV. The SUV sped away, running a stop sign. Barahona saw a little girl lying on the ground next to Avila's car and bleeding from the back. At trial, Barahona identified the shooter as Banks.

Yenicelli Centeno lived in the same apartment complex as Avila and knew Avila and his family. On the day of the shooting, Centeno was in her apartment when she heard three gunshots. She looked out her window and saw a man bending down into Avila's blue car as if "searching for something." The man stood up and walked toward a silver car. On his way toward the car, he picked up a small black object from the ground. The man then got into the front passenger seat of the car, and the car sped away.

Paramedics arrived and took Kaitlyn and Avila to the hospital. Kaitlyn subsequently died of a single gunshot wound to the chest. Avila was in the hospital for two weeks before he was discharged.

2.     *Police investigation*

Days after the shooting, the police received three anonymous phone calls about the crime. In each of the calls the caller said "Gambino" or "Bambino" was involved in the shooting. Detectives consulted with a gang expert and determined that Banks was known as "Gambino" or "Bambino."

Detectives also interviewed Kerry Cahee, a known Black P. Stones gang member. Cahee said two fellow Black P. Stones

members were involved in the shooting: Banks, who went by "Bambino," was the shooter, and Larrimore, who went by "Boogie" or "Boogie Stone," was the driver.

Cahee told detectives that Larrimore and Banks were headed to a Black P. Stones gang meeting at Kenneth Hahn Park before the shooting. The day after the shooting, Banks called Cahee and said he had shot a rival gang member from the 18th Street gang, that the shooting of the girl "was an accident," and that Larrimore was the driver. The next day, Larrimore also had a telephone conversation with Cahee in which he confirmed that he was the driver, that Banks shot a "Hispanic" man, and "that the child was a mistake."[2]

In October 2006, while Avila was still in the hospital, a detective showed him photographic lineups that included photographs of Larrimore and Banks. Avila identified Banks as the shooter and Larrimore as the driver, but he noted he would like to see Larrimore in person "to be sure." At trial, Avila testified he was certain that Larrimore was in fact the driver. Later, a detective showed Centeno a photo lineup that included a photograph of Banks. Centeno identified Banks as the person she saw bending into Avila's car.

In October 2006, detectives searched the motel room where Larrimore had been staying. They found a firearm in a nightstand, which they later determined not to be the murder weapon. Officers also found car rental receipts in Larrimore's name showing he had returned a silver SUV the day after the shooting.

---

[2] Cahee testified at trial that he lied when he spoke to detectives, and he denied any knowledge of the identify of the perpetrators.

### 3. *Gang expert testimony*

Los Angeles Police Officer Brian Thayer testified as an expert on the Black P. Stones gang. Avila's apartment complex was "right in the heart" of the Black P. Stones' territory. Both Larrimore and Banks were members of the Black P. Stones. Larrimore's gang moniker was "Boogie" or "Boogie Stone," and Banks's moniker was "Gambino."

The Black P. Stones's "most hated" gang was a Hispanic gang known as the 18th Street gang. The rivalry between the two gangs was "pretty intense, to the point where [there were] several shootings … between the two gangs." According to Thayer, it was "uncommon" and "very disrespectful" for an 18th Street gang member "to be seen in the open, in the middle of the day, in Black P. Stones area." If a Black P. Stones member saw somebody whom they thought was an 18th Street member in Black P. Stones territory, the Black P. Stones member would respond.

According to Thayer, there were different levels of participation in the Black P. Stones gang. "[H]ard-core" gang members were "very active" and "very involved" in the gang. They were "out there making a name for the gang" and "committing the burglaries, the robberies, the carjackings, the murders, [and] the … assaults with deadly weapons." "A lot of times they're the younger guys that have to prove themselves" to the older members.

Black P. Stones frequently had gang meetings, especially during September 2006. Around that time, an older member of the Black P. Stones had been released from prison and "was trying to get the gang … back into a violent active gang." The purpose of the meetings was to discipline members who "weren't

6

living up to the standards of the gang," tell members what areas needed more criminal activity, and inspire members to stay active in the gang lifestyle. It was important for younger members to demonstrate at the meetings that they were active members.

Thayer testified that murder was the "ultimate crime" a Black P. Stones member could commit for the gang because it showed dedication to the gang. Committing a murder for the gang would elevate a member's status.

C.    *Defense Evidence at Trial*

Banks testified that in September 2006, he was 17 years old. He denied being a Black P. Stones member but admitted he associated with the gang. He also admitted that his nickname was "Bambino" or "Gambino."

On the day of the shooting, Banks was planning to attend a picnic at a park to celebrate someone who had just gotten out of prison. Banks knew Black P. Stones members would be there but denied it was a gang meeting. Larrimore and two other individuals offered Banks a ride in their silver car. Larrimore, whom Banks knew as "Boogie," was driving; Smith, whom Banks knew as "Little Marky Boy," was in the front passenger seat; and the third person, whom Banks knew only as "Little J-Hall," was seated in the back. Smith and "Little J-Hall" were both known gang members. Banks got in the back seat.

When Larrimore turned onto Pinafore Street, Smith pointed to a moving blue car and said, " 'Do you see that?' " Larrimore said, "There you go, right there." Larrimore turned into an alley, stopped the car, and briefly got out, before driving back onto Pinafore Street with a gun on his lap. Banks admitted he told police that Larrimore "pointed out the Hispanic guy,"

"drove his car around through the alley," and "positioned it next to the blue [car]."

At that point, Banks asked to be taken home, and Larrimore agreed. As Larrimore drove on Pinafore Street, however, the car suddenly stopped. Banks heard three gunshots and immediately ducked. He did not hear anyone say, "Fuck 18th Street" or "Black P. Stones." He also did not see anyone shooting from inside the car. After the car sped away, Banks saw Smith holding a gun. Larrimore and the others took Banks home, and Smith told Banks not to say anything.

D.    *Verdict and Sentencing*

At trial, the court instructed the jury on two theories of second degree murder: murder with malice aforethought and murder under the natural and probable consequences theory. As to the natural and probable consequences theory, the court specifically instructed the jury that to find a defendant guilty of murder, it had to find the defendant aided and abetted the attempted murder of Avila, and "[t]he crime of murder was a natural and probable consequences" of the attempted murder.

The jury found Larrimore guilty of the second degree murder of Kaitlyn and guilty of the attempted willful, deliberate, and premeditated murder of Avila. The jury also found true, as to each count, the firearm enhancements (§ 12022.53, subds. (b)-(e)) and the gang enhancements (§ 186.22, subd. (b)). The jury was unable to reach a unanimous verdict on the count of attempted murder of Cassey, and the court declared a mistrial as to that count.[3]

---

[3]    The jury was also unable to reach a unanimous verdict as to Banks on all counts, and a mistrial was declared for each count

8

The trial court sentenced Larrimore to a total term of 72 years to life in state prison. As to the second degree murder of Kaitlyn, the court sentenced Larrimore to a term of 15 years to life, plus 25 years to life based on the firearm enhancement (§ 12022.53, subds. (d), (e)(1)). As to the attempted murder of Avila, the court sentenced Larrimore to a consecutive term of seven years to life, plus 25 years to life based on the firearm enhancement (§ 12022.53, subd. (d)).[4]

Larrimore appealed from the judgment. This court struck the gang and firearm enhancements for both counts.[5] Otherwise, the judgment was affirmed. (*People v. Larrimore* (June 5, 2012, B221303) [nonpub. opn.].)

---

alleged against Banks. After a retrial, a jury found Banks guilty on all counts and found all the allegations true.

[4] The court did not impose an additional prison term based on the gang enhancements. (§ 186.22, subd. (b)(5) [if the underlying count is a felony punishable by imprisonment in the state prison for life, the defendant is subject to a 15-year minimum parole eligibility term]; *People v. Lopez* (2005) 34 Cal.4th 1002, 1004 [gang-related first degree murder is punishable by a 15-year minimum parole eligibility term, not an additional 10-year gang enhancement].)

[5] This court determined the prosecution presented insufficient evidence to establish the primary activities element of the gang enhancements. (*People v. Larrimore* (June 5, 2012, B221303) at pp. 32-36 [nonpub. opn.].) Further, reversal of the gang enhancements required reversal of the firearm enhancements imposed pursuant to section 12022.53, subdivisions (d) and (e). (*Larrimore*, at p. 36.)

E.    *Resentencing Proceedings*

In 2021, Larrimore filed a petition for resentencing with respect to his murder conviction.  He filed a second petition for resentencing as to his attempted murder conviction in 2022.  After appointing counsel and receiving memoranda from the parties, the superior court issued an order to show cause on both petitions.

In 2024, the court held an evidentiary hearing.  Both parties relied on the transcripts from Larrimore's jury trial and did not present any other evidence.  The People argued Larrimore was guilty of murder and attempted murder under a theory of direct aiding and abetting.  They contended the evidence showed Larrimore believed rival gang members were in Avila's car; Larrimore wanted to kill rival gang members; and he "aided and abetted … the shooting of … Avila" and "the shooting of whoever was in the back seat of [Avila's] car."  The defense argued that "at a minimum," Larrimore could not be found guilty of the murder of Kaitlyn because there was no evidence Larrimore "had any knowledge of … Banks's intention to go back to [Avila's] car and shoot into the car," killing Kaitlyn.

The court denied the petitions, finding beyond a reasonable doubt Larrimore was guilty of murder and attempted murder under a theory of direct aiding and abetting.  The court found Larrimore aided and abetted "the shooting" of Avila and "the shooting of individuals that were in [Avila's] car perceived as rival gang members."

Larrimore timely appealed.

10

## DISCUSSION

A.    *Section 1172.6 and Standard of Review*

Effective 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437) substantially modified the law governing accomplice liability for murder.  (*People v. Curiel* (2023) 15 Cal.5th 433, 448; *People v. Strong* (2022) 13 Cal.5th 698, 707-708.)  Pertinent here, it eliminated liability for murder as an aider and abettor under the natural and probable consequences doctrine[6] by amending section 188.  (*People v. Patton* (2025) 17 Cal.5th 549, 558; *Curiel*, at p. 449.)  "[U]nder prior law, a defendant who aided and abetted an intended assault could be liable for murder, if the murder was the natural and probable consequence of the intended assault. [Citation.]  The defendant need not have intended the murder or even subjectively appreciated the natural and probable consequences of the intended crime." (*Curiel*, at p. 449.)  Now, section 188 provides that, except in cases of felony murder, "a principal in a crime shall act with malice aforethought" to be convicted of murder.  (§ 188, subd. (a)(3).)  "Malice shall not be imputed to a person based solely on his or her participation in a crime." (*Curiel*, at p. 449.)

SB 1437 also added former section 1170.95 (now section 1172.6) to the Penal Code "to provide 'a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief.' " (*People v. Antonelli* (2025) 17 Cal.5th 719, 724.)  The resentencing procedure begins with the filing of a petition containing a declaration that all requirements

---

[6]    The natural and probable consequences doctrine is also sometimes referred to as " 'indirect' " aiding and abetting. (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1057.)

11

for eligibility are met.  (§ 1172.6, subd. (b)(1)(A); *People v. Strong, supra*, 13 Cal.5th at p. 708.)  The superior court must then determine whether the petitioner has made a prima facie showing that he or she is entitled to relief.  (§ 1172.6, subds. (a)-(c); *Strong*, at p. 708.)  If the petitioner has made a prima facie showing he or she is entitled to relief, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts.  (§ 1172.6, subd. (d)(1).)  At the evidentiary hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony." (§ 1172.6, subd. (d)(3).)  The petitioner and the prosecutor may also offer new or additional evidence.  (*Ibid*.)

On appeal from an order denying a petition under section 1172.6 following an evidentiary hearing, we apply the substantial evidence standard of review.  (*People v. Emanuel* (2025) 17 Cal.5th 867, 885.)  "Under this standard, 'we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact" ' " ' could find [the necessary fact] beyond a reasonable doubt."  (*Ibid*.)  " ' " 'While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' " ' "  (*People v. Pittman* (2023) 96 Cal.App.5th 400, 414.)  " ' " 'Substantial evidence includes circumstantial

12

evidence and any reasonable inferences drawn from that evidence.” ’ ” (*People v. Navarro* (2021) 12 Cal.5th 285, 339.)

B.    *Substantial Evidence Supports the Superior Court’s Finding Larrimore Is Guilty of Murder on a Theory of Direct Aiding and Abetting Implied Malice Murder*

Larrimore contends the evidence only supported a finding that he aided the shooter in attempting to kill Avila.  He asserts he “did nothing to aid and abet [the shooter’s] separate actions of going to Avila’s car and shooting and killing a three-year-old girl seated inside Avila’s car.”  However, substantial evidence supports his second degree murder conviction of Kaitlyn based on a theory of direct aiding and abetting implied malice murder.

1.    *Legal principles*

“Second degree murder is an unlawful killing with malice aforethought, but without the premeditation or deliberation required for first degree murder.  [Citation.]  Malice may be express or implied.  [Citation.]  Malice is express when a defendant intends to kill and implied when a defendant consciously disregards danger to human life.” (*In re Ferrell* (2023) 14 Cal.5th 593, 600; see *People v. Knoller* (2007) 41 Cal.4th 139, 143, 151, 156-157; *People v. Gudiel* (2024) 107 Cal.App.5th 848, 859.)

“ ‘[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts.’ ” (*People v. Hin* (2025) 17 Cal.5th 401, 455.)  Direct aiding and abetting implied malice murder remains a valid theory of murder liability after SB 1437.  (See *People v. Reyes* (2023) 14 Cal.5th 981, 990 (*Reyes*) [“a defendant may directly aid and abet an implied malice murder”]; *People v. Gentile* (2020) 10 Cal.5th 830, 848, 850 [“notwithstanding Senate Bill 1437’s

13

elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life"].)

"'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Reyes*, *supra*, 14 Cal.5th at pp. 990-991.) "'The relevant act is the act that proximately causes death.'" (*Id.* at p. 991.) The act "must not merely be dangerous to life in some vague or speculative sense; it must '"involve[ ] a high degree of probability that it will result in death."'" (*Id.* at p. 989.)

2. *Substantial evidence of direct aiding and abetting implied malice murder*

Larrimore does not dispute that the shooting in this case "was the act that proximately caused Kaitlyn's death." When a shooting is the life-endangering act, the aider and abettor must

14

"kn[o]w that [the shooter] intended to shoot at the victim, [intend] to aid him in the shooting, kn[o]w that the shooting was dangerous to life, and [act] in conscious disregard for life." (*Reyes*, *supra*, 14 Cal.4th at p. 992.) Larrimore contends "there is simply no substantial evidence that [he] had the requisite knowledge or intent." As Larrimore states, "the shooting of Kaitlyn was unintended." He points to evidence in the record that Larrimore and Banks said Kaitlyn's shooting was "an accident" and "a mistake."

Even if Kaitlyn was not the shooter's specific target, that fact is not determinative. Implied malice does not require awareness of a life-threatening risk "to a particular person." (*People v. Albright* (1985) 173 Cal.App.3d 883, 887; accord, *People v. Taylor* (2004) 32 Cal.4th 863, 868.) "Instead, implied malice may be found … whenever … the facts establish a defendant's awareness and conscious disregard that his conduct poses a high probability of death to *some* person." (*Albright*, at p. 887; accord, *Taylor*, at p. 868 ["It is plain that *implied* malice aforethought does not exist in the perpetrator only in relation to an intended victim. Recklessness need not be cognizant of the identity of a victim or even of his existence."].) "There is no requirement the defendant specifically know of the existence of each victim." (*Taylor*, at p. 868; see, e.g., *ibid.* ["if a gunman simply walked down the hall of an apartment building and fired through the closed doors, he would be liable for the murder of all the victims struck by his bullets—including … an infant concealed by the bed covers"].) Thus, Larrimore is guilty of aiding and abetting implied malice murder if he knew the shooter intended to shoot at *some* person and Larrimore intended to aid in that shooting.

15

As to Kaitlyn's shooting, there is substantial evidence Larrimore knew the shooter intended to shoot at rival gang members, and Larrimore intended to aid in the shooting of rival gang members. " '[E]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) " 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) Larrimore's conduct before the shooting, his presence at the scene, and his conduct after the shooting all support the conclusion that he aided and abetted the shooting.

First, the evidence shows that before the shooting, Larrimore, a member of Black P. Stones, was driving to a Black P. Stones meeting with Banks, another fellow gang member, and potentially two other members. Around the time of the shooting, an older gang member was pushing the gang to become more violent, and one of the purposes of the meeting was to discipline underperforming gang members. This evidence supports an inference that as Larrimore drove to the gang meeting, there were pressures on him and the other occupants of the car to engage in more violent acts for the gang. (See *Nguyen*, *supra*, 61 Cal.4th at p. 1055 ["Although 'gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime,' " gang expert testimony can strengthen "inferences arising from other evidence specific to [a] defendant's role in the crime at issue."].)

16

On the way to the meeting, the front passenger pointed at Avila's blue car, and Larrimore said, "There you go, right there" while the blue car was still on the street. The trial court as factfinder could reasonably conclude from Larrimore's statement that he identified Avila's car as a potential target. After making the statement, Larrimore turned into an alley, retrieved a gun, and then circled back to Avila's car. By obtaining a gun, Larrimore "considered the possibility of a violent encounter." (*People v. Lee* (2011) 51 Cal.4th 620, 636 [evidence defendant brought a loaded handgun "makes it ' "reasonable to infer that he considered the possibility of homicide from the outset" ' "].) Larrimore then stopped close to Avila's car and stared at Avila while the front passenger pointed a gun at Avila and shouted, "Fuck 18" and "Black P. Stones." Because the passenger shouted, "Fuck 18," and did not expressly call out any specific person, the court could infer that Larrimore knew his confederate planned to confront Avila *and* any other 18th Street gang members in the car.

Moreover, according to Thayer, Avila's apartment building was in Black P. Stones territory, and Black P. Stones and 18th Street were extreme rivals, "to the point where [there were] several shootings … between the two gangs." If a Black P. Stones member saw an 18th Street gang member in Black P. Stone territory, it would provoke a reaction from the Black P. Stones member. The "ultimate" reaction for the Black P. Stones gang was a murder.

From this evidence, the court could conclude that Larrimore knew his cohort planned to shoot rival gang members in Avila's car and intended to aid in the shooting. (Cf. *Nguyen, supra*, 61 Cal.4th at pp. 1053-1055 [substantial evidence of direct

17

aiding and abetting express malice murder where, in the context of an ongoing gang war, the car in which defendant was riding pursued another car with rival gang members and a passenger in defendant's car fired at the other car].)

In addition to Larrimore's conduct before the shooting, Larrimore was present during every stage of the shooting. He waited in the car, two feet away from Avila's car, while his cohort shot Avila twice, fired a third shot into Avila's car, and then returned to Larrimore's car. Although Larrimore's " ' "mere presence alone at the scene of the crime is not sufficient to make [him] a participant," ' his presence in the car ' "may be [a] circumstance[ ] that can be considered by the [trier of fact] with the other evidence in passing on his guilt or innocence." ' " (*Nguyen, supra*, 61 Cal.4th at p. 1055.)

Larrimore's conduct after the shooting further supports the court's finding that Larrimore directly aided and abetted the shooting of Kaitlyn. After the shooting, Larrimore did nothing to help Kaitlyn, who was lying on the ground next to Avila's car, and instead fled the scene with the shooter. (*People v. Lara* (2017) 9 Cal.App.5th 296, 322 [flight is relevant to whether a defendant aided and abetted the commission of the crime]; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 329 [flight and failure to call for assistance may imply consciousness of guilt].) Larrimore also spoke about the crime the next day and did not express any remorse or surprise about the shooting in general. Therefore, considering Larrimore's conduct all together, there is substantial evidence that he directly aided and abetting the second degree murder of Kaitlyn.

Larrimore exclusively relies on *Reyes* to argue the evidence was insufficient to support the superior court's finding. His

18

reliance on that case is misplaced. In *Reyes*, the defendant appealed the superior court's denial of his section 1172.6 petition as to his second degree murder conviction. (*Reyes*, *supra*, 14 Cal.5th at p. 984.) It was undisputed that the defendant was not the shooter. Rather, he had joined other fellow gang members on bikes as they chased a car; another gang member shot the car's driver. (*Id*. at pp. 984-985.) The Supreme Court determined there was insufficient evidence on a *direct perpetrator theory* to support the trial court's conclusion that the defendant was guilty of implied malice murder, because the defendant's acts of bicycling into rival territory and chasing after the victim's car with fellow gang members were "too attenuated in the chain of events to have proximately caused the killing." (*Id*. at p. 989.)

However, as to the direct aiding and abetting theory, the Supreme Court determined the trial court had misunderstood the legal requirements of direct aiding and abetting implied malice murder. The Supreme Court held the trial court "should have asked whether [the defendant] knew that [the shooter] intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious regard for life." (*Reyes*, *supra*, 14 Cal.5th at p. 992.) The Supreme Court remanded the matter for the trial court to properly consider whether the defendant was guilty under this theory, and "express[ed] no view on the merits of [the defendant's] resentencing petition under a proper application of the elements of implied malice murder on a direct aiding and abetting theory." (*Id*. at p. 992.) Accordingly, *Reyes* does not speak to the issue before us, which is whether there is sufficient evidence to support implied malice murder under a direct aiding and abetting theory.

## DISPOSITION

The judgment is affirmed.


STONE, J.

We concur:


MARTINEZ, P. J.


FEUER, J.